IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| SCOTT BURNSIDE, on behalf of himself and all others similarly situated, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | CLASS ACTION COMPLAINT FOR |
| | : | VIOLATION OF FEDERAL SECURITIES |
| | : | LAWS |
| v. | : | |
| | : | |
| JOHN J. RIGAS, MICHAEL J. RIGAS, | : | |
| TIMOTHY J. RIGAS, and JAMES P. | : | |
| RIGAS | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |
| | : | |

---

## NATURE OF THE ACTION

Plaintiff, individually and on behalf of all others similarly situated, by and through

his attorneys, alleges the following on information and belief, except as to allegations

concerning his own actions, based upon an investigation made by and through his

counsel.  This is a securities fraud class action brought on behalf of all purchasers of the

securities of Adelphia Business Solutions, Inc. ("Adelphia Solutions" or the "Company")

between January 6, 2000 and March 27, 2002, inclusive, (the "Class Period"), for violations of

the Securities Exchange Act of 1934 (the "Exchange Act").  Adelphia Solutions is a Delaware

corporation with it principal executive offices located at One North Main Street, Coudersport,

Pennsylvania.  The Company provides integrated telecommunications services to businesses,

governmental and educational customers. Adelphia Solutions provides local phone, long

distance, high speed data transmission and Internet connectivity services. Prior to January 11,

2002, the Company was a majority (79%) owned subsidiary of Adelphia Communications Corp.

("Adelphia"). On January 11, 2002, Adelphia distributed all of its shares of Adelphia Solutions

stock to the shareholders of.Adelphia Solutions.  As a result, the Rigas Defendants received a direct majority ownership of Adelphia Solutions.  On March 27, 2002, Adelphia Solutions filed for Chapter 11 Bankruptcy protection.  For this reason, and this reason alone, Adelphia Solutions is not named as a defendant herein.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and §27 of the Exchange Act (15 U.S.C. §78aa).

2.      This action arises under §10(b) and §20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      Venue is proper in this district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this district and Defendants conduct substantial business in this District.

4.       In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Scott Burnside purchased Adelphia Solutions securities during the Class Period as set forth in the attached Certification which is incorporated herein by reference, and was damaged thereby.

6.      The Defendants (collectively referred to herein as the "Rigases" or "Defendants"),

at all times relevant hereto, served in the capacities listed below and received substantial compensation from Adelphia Solutions for their service:

(a) Defendant John Rigas is Chairman of the Board of Directors of Adelphia Solutions. In addition, John Rigas is the founder, Chairman of the Board, President and Chief Executive Officer of Adelphia. John Rigas owns or controls over 74% of the Class B common stock of Adelphia. As of April 1, 2001, John Rigas owned or controlled approximately 649,500 shares of Adelphia Solutions Class A common stock. Additionally, John Rigas is the father of Defendants Michael J. Rigas, Timothy J. Rigas and James P. Rigas.

(b) Defendant Michael J. Rigas is Vice Chairman, Secretary and a Director of Adelphia Solutions. In addition, Michael Rigas served as Executive Vice President, Operations and a Director of Adelphia. As of April 1, 2001, Michael J. Rigas owned or controlled approximately 53.7% shares of the outstanding Class B common stock of Adelphia and 602,500 shares of Class A common stock of Adelphia Solutions.

(c) Timothy J. Rigas is Vice Chairman, Chief Financial Officer, Treasurer and a Director of Adelphia Solutions. In addition, Timothy J. Rigas was Executive Vice President, Chief Financial Officer, Chief Accounting Officer and Treasurer of Adelphia. As of April 1, 2001, Timothy J. Rigas owned or controlled more than 53% of the outstanding Class B common stock of Adelphia and 592,500 shares of Class A common stock of Adelphia Solutions.

(d) James P. Rigas is Vice Chairman, Chief Executive Officer, President and a Director of Adelphia, Solutions. In addition, James Rigas served as Executive Vice.President, Strategic Planning of Adelphia. As of April 1, 2001, James P. Rigas owned or controlled more than 49% of the outstanding Class B common stock of Adelphia and 642,500 shares of the Class

A common stock of Adelphia Solutions.

7.    The Defendants were the senior officers and/or directors of Adelphia Solutions. Defendants were also controlling stockholders of Adelphia Solutions whether by their majority ownership interest in Adelphia prior to the distribution of Adelphia's ownership interest in Adelphia Solutions or as majority stockholders of Adelphia Solutions after the distribution of Adelphia's interest.  Thus, Defendants were controlling persons of the Company.  In addition, Defendants had the ability and influence, and exercised said ability and influence, to cause Adelphia Solutions to engage in the unlawful practices complained of herein. Because of their executive, managerial and/or directorial positions with Adelphia Solutions and Adelphia, Defendants had access to and the ability to influence the adverse, non-public information regarding the business, finances, strategy and future business prospects of Adelphia Solutions as further detailed herein and acted to misrepresent, misstate or conceal such information from plaintiff, class members, and the investing public.

8.    The Defendants participated in the wrongdoing complained of herein in order to, among other things:

(a) inflate and maintain the price of the securities of the Company and of Adelphia;

(b) protect and enhance their position as officers and/or directors of Adelphia and Adelphia Solutions and the substantial compensation and prestige they obtained thereby;

(c) enhance the value of their personal holdings of Adelphia and Adelphia Solutions securities and permit them to purchase additional common stock and maintain adequate margin levels; and

(d) misstate Adelphia Solutions' assets, revenues and earnings in order to inflate the price of Adelphia Solutions and Adelphia securities.

9.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated and continues to operate as a fraud or deceit on purchasers of Adelphia Solutions securities, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme described herein: (a) deceived the investing public with regard the business, finances and value of Adelphia Solutions' assets and securities; and (b) caused plaintiff and other members of the Class to purchase Adelphia Solutions securities at artificially inflated prices.

10.     Each of the Defendants knew of and/or recklessly disregarded the fact that the illegal acts and practices, as well as the misleading statements and omissions described herein would adversely affect the integrity of the market for Adelphia Solutions securities and would artificially inflate or maintain the price of those securities.  Each of the Defendants, by the acts described herein, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and members of the Class which plaintiff seeks to represent.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

11.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons who purchased or otherwise acquired Adelphia Solutions securities between January 6, 2000 and March 27, 2002, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of each of the immediate families, any subsidiary or affiliate of Adelphia or Adelphia Solutions and the directors and officers of Adelphia or Adelphia Solutions or their

subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person..

12.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States.  As of November 9, 2001, there were nearly 48 million shares of Adelphia Solutions Class A common stock and nearly 87 million shares of Adelphia Class B common stock outstanding. Throughout the Class Period, Adelphia securities were actively traded on the national securities exchanges.  Record owners and other members of the Class may be identified from records maintained by Adelphia Solutions and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

13.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

14.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether Defendants participated in and pursued the common course of conduct complained of herein;

(c) whether documents, press releases, SEC filings and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, financial condition, assets and prospects of Adelphia Solutions;

(d) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, performance and prospects of Adelphia Solutions;

(e) whether the market price of Adelphia Solutions securities during the Class Period was artificially inflated due to the material misrepresentations and omissions of material facts complained of herein; and

(f) to what extent the members of the Class have sustained damages and the proper measure of damages.

16.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

### A. Inflated Customer Numbers

17.    Defendants portrayed Adelphia Solutions, during the Class Period, as a growing telecommunications business.  One of the key indicators of the Company's growth which investors considered was the number of new customers that Adelphia Solutions assigned to its available telecommunications lines. These "line counts" were important indicators of new business and the growth of Adelphia Solutions.  Additionally, the number of customers that retained their lines and did not end their service was important in arriving at a net "line count" for Adelphia Solutions.

18.    Defendants wanted to focus on the growth that the Company was experiencing by publicly reporting Adelphia Solutions' line count statistics.  However, Defendants knew or were reckless in disregarding that the line counts reported to the investing public were grossly overstated because of the Company practices instituted or approved by Defendants.  These practices included:

• Adding hundreds of lines to existing customers who never ordered them and disconnecting the lines within the same month without, reporting the termination thus keeping the net line number artificially high.  Adelphia Solutions' customers were not aware of the additional lines in most cases because the service was terminated in the same month so they would not show up on the customers bill.

• Businesses were added to the Company's rolls of "new customers" despite the fact that the businesses had never signed up for or contracted for such services.  The Company would then either disconnect the lines in the same month without reporting the disconnection or simply discard the "customers" bills.  This practice also led to the artificial inflation of the Company's line counts that were reported to the investing public.

• Businesses with a history of bad credit, often with Adelphia Solutions itself, were entered as "new lines" when the customer had never requested new or additional service and the Company knew that they could not pay for it in any event.

• Customers who had disconnected or terminated all or a portion of their service were still listed in Adelphia Solutions reports to the investing public as being billed for the disconnected disconnected or terminated service. Again, bills for the disconnected lines were destroyed.

19.    Defendants supported and in some cases actually instituted the improper sales and accounting practices described above.  As early as November, 2000, Adelphia personnel, who were responsible for billing Adelphia Solutions customers, notified the Company's accounting department as well as top Adelphia Solutions' executives that the line counts being reported to the public by various cities were dramatically overstated and inaccurate.

**Defendants' False and Misleading Statements Regarding Line Counts**

20.    On January 6, 2000, Defendants caused Adelphia Solutions to issue a press release announcing the Company's estimate that it:

> Sold approximately 87,570 new access lines and installed approximately 80,200 new access lines during the fourth quarter ended  December 31, 1999. For the year ended December 31, 1999, the Company estimates that it has sold approximately 221,000 new access lines. As of December 31, 1999, the Company estimates that its has a total of approximately 331,000 access lines installed, of which approximately 55% were provisioned on its own network (on-switch).

21.    In each of the Company's Form 10-Q's during the Class Period, Defendants continued to cause Adelphia Solutions to report false and misleading line counts as follows:

| New Lines Sold | New Lines Installed | Time Period | Source (date) |
|---|---|---|---|
| 87,570 | 80,202 | Qtr end 12/31/99 | 10-K (3/30/00) |
| 72,572 | 81,165 | Qtr end 3/31/00 | Press Release (5/9/00) |
| 72,268 | 81,460 | Qtr end 6/30/00 | Press Release (8/9/00) |
| 103,139 | 83,225 | Qtr end 9/30/00 | Press Release (11/9/00) |

22.     At year end 2000, Defendants were forced to begin addressing some of the accounting problems due to their false and deceptive acts and practices.  Specifically, for the quarter ending December 31, 2000, Defendants caused Adelphia Solutions to take a charge of $15 million for "potentially uncollectible accounts receivable associated primarily with Internet service providers." However, given Defendants' false sales and billing practices, it is clear that this simply an effort to begin to disclose the improper sales and billing practices of Adelphia Solutions.  Defendants still continued to conceal the fact that many of the "lines" connected to Adelphia Solutions' system were the product of artificial counts of customers that had either cancelled service or never had it in the first place, or other improper sales practices. Throughout the Class Period, Defendants failed to disclose the impact of their deceptive sales practices of Adelphia Solutions reported level of line counts and its business in general.

**B. Commitments to Adelphia Communications' Corporate Overhead**

23.     Defendants caused the Company to enter into various agreements with Adelphia pursuant to which Adelphia Solutions would be obligated under certain circumstances to make payments to Adelphia.  Additionally, the Company was obligated to share corporate overhead services and other business expenses and services with Adelphia, despite the fact that class members were never informed of such commitments. Rather, Defendants would simply make

such agreements based on the financial needs of any one of the companies under the control of the Defendants.

24.    Despite their personal direction provided to the companies owned by the family, Defendants misleadingly caused Adelphia Solutions to represent to investors that its corporate overhead expenses were allocated with some reasonable relationship to Adelphia Solutions' actual usage of overhead services, when this was not actually the fact.

**Defendants' False and Misleading Statements Regarding Corporate Overhead**

25.    For example, the proxy statement issued by Adelphia Solutions on July 7, 2000, stated:

> During the year ended December 31, 1999, the Company made demand advances Adelphia periodically, for which the Company earned interest at 5.15%, totaling approximately $8.5 million. During the period January 1, 1999 to December 31, 1999, the largest amount due from Adelphia Communications at the end of any quarter was approximately $392.6 million at December 31, 1999.
>
> The Company and Adelphia Communications have entered into a registration rights agreement, as amended, whereby the Company has agreed to provide to Adelphia Communications and certain permitted transferees, with respect to common stock owned by them, two demand registration rights per year under certain conditions, including that any such demand be with respect to shares with a minimum of $10 million in market value, and with certain piggyback registration rights in future public offerings of the common stock.  Adelphia Communications' demand registration rights terminate at such time as Adelphia Communications creases to hold at least $10 million in market value of common stock.
>
> During the year ended December 31, 1999, the Company incurred charges from Adelphia Communications of approximately $8.6 million for the provision to the Company to shared corporate overhead services in areas such as personnel payroll, management information services, computer services, shared use of office, aircraft and network facilities and support equipment. The Company expects that shares for the provision of similar services by Adelphia Communications to the Company, or by the Company to Adelphia Communications will continue to be incurred or charged by these services have

been based on allocation of Adelphia Communications' incremental costs incurred for these services, and do not necessarily represent the actual costs that would be incurred if the Company was to secure such services on its own or the Management Services Agreement between the Company and Adelphia Communications dated April 10, 1998, with respect to shared corporate overhead service. During the year ended December 31, 1999, the Company (i) paid Adelphia Communications or certain of Adelphia Communications' affiliates, fiber lease payments of approximately $0.2 million, (ii) received from Adelphia Communications $1.8 million in revenue for providing switched services, and (iii) paid to entities owned by members of the Rigas family who are executive officers of the Company approximately $1.6 million for property, plant and equipment and services.

26.    Defendants referral to the overhead expenses in Adelphia Solutions other public filings as "corporate overhead" was false and misleading to investors.  The levels of "corporate overhead" reported by Defendants in Adelphia's public filings were as follows:

| Corp. Overhead | Source |
|---|---|
| $15.9 million | 10-Q (05/15/00) |
| $14.1 million | 10-Q (08/14/00) |
| $17.1 million | 10-K (04/02/01) |
| $23.7 million | 10-K (04/02/01) |
| $17.2 million | 10-Q (08/14/01) |
| $14.4 million | 10-Q (08/14/01) |
| $14.8 million | 10-Q (11/13/01) |

27.    The proxy statement and Adelphia Solutions' other public filings identified in ¶32 herein were false and misleading in that they violated generally accepted accounting practices ("GAAP"). Adelphia Solutions did not properly account for its corporate overhead expenses it paid to Adelphia. Among other things, Adelphia Solutions engaged in the following practices:

(a) Adelphia Solutions and Adelphia failed to properly account for labor, operating, equipment, circuit network and other costs to the appropriate companies. Where employees worked in part for Adelphia Solutions, their time was not fully or accurately accounted to Adelphia Solutions;

(b) Software applications licensed from Remedy, Microsoft Veritas and Oracle have been provided by Adelphia to Adelphia Solutions with no or inadequate accounting and licensing documentation, including proper notice to the manufacturer;

(c) Hardware and network circuits have been used and routed to Adelphia Solutions from Adelphia or other entities with no or inadequate accounting documentation;

(d) Office space (rooms, etc.) were utilized by Adelphia Solutions in Coudersport, Pennsylvania in buildings or spaces shared with Adelphia without any or with inadequate documentation and accounting; and

(e) Powerlink network sales, support, accounting and provisioning services were shared with Adelphia Communications with no or inadequate accounting documentation.

**C.  Adelphia's Off-balance Sheet Liabilities**

28.    Throughout the Class Period, Adelphia's debt was understated because the Rigases omitted material off-balance sheet liabilities for which they and Adelphia were co-liable. The Rigases and Adelphia had entered into agreements with entities controlled by the Rigases pursuant to which Adelphia guaranteed certain loans, in excess of $2 billion. Adelphia Solutions, because of its heavy dependence on the Rigases and Adelphia was materially impacted by these off-balance sheet liabilities and they should have been publicly disclosed to Adelphia Solutions investors.

**Defendants' False and Misleading Statements Regarding Off-Balance Sheet Liabilities**

29.    Defendants' public statements did not disclose the off-balance sheet liabilities. For example, in Adelphia Solutions' proxy statement, disseminated July 6, 2001, Defendants

caused Adelphia Solutions to state:

> The Company and certain of Adelphia Communications' other subsidiaries and affiliates are parties to a joint bank credit facility. As part of this facility, the Company and its subsidiaries have the ability to borrow up to an aggregate of $500.0 million which, if borrowed, would be guaranteed by other members of the borrowing group. As of December 31, 2000, a subsidiary of the Company had borrowed $500.0 million under this credit facility. In addition, the Company has agreed to pay a subsidiary of Adelphia $15.0 million as a fee for placing the credit facility. The interest rate at which the Company has borrowed these funds is 12 1/2%, a portion of which is payable to a subsidiary of Adelphia. For the year ended December 31, 2000, the Company recorded $21.9 million for interest expense relating to the credit facility, $7.0 million of which was payable to a subsidiary of Adelphia.

Given this heavy dependence on Adelphia, the off-balance sheet liabilities of Adelphia were material to the ability of Adelphia Solutions to maintain its sources of financing.

30.    The proxy statement and Defendants 10-Q's and 10-K's filed during the Class Period identified in ¶32 herein were false and misleading and violated GAAP because they failed to disclose the off-balance sheet liabilities of Adelphia and their impact on Adelphia Solutions.

**The Truth Emerges**

31.    On March 1, 2002, Adelphia Solutions announced that it would not make an interest payment of $15.3 million on certain secured notes of the Company and that it, therefore, would be in default of these notes.

32.    On March 27, 2002, Adelphia announced its results for the fourth quarter for the year ended December 31, 2001. In the press release, the footnote disclosures for the financial statements noted the following:

> Certain subsidiaries of the Company are co-borrowers with certain companies owned by the Rigas family and managed by the Company ("Managed Entities") for borrowing amounts of up to $5,630,000[,000]. Each of the co-borrowers is liable for all borrowing under the credit facilities and may borrow up to the full

amount of the facilities. Amounts borrowed under these facilities by the
Company's subsidiaries are included as debt in the Company's consolidated
balance sheet. Amounts borrowed by Managed Entities under the facilities are not
included on the Company's consolidated balance sheet. . . . As of December 31,
2001, co-borrowing credit facilities balances, net of amount otherwise reflected as
debt on the Company's consolidated balance sheet, totaled approximately
$2,284,000[,000].

33.     In a conference call following the announcement of financial results, Adelphia
announced that it had entered into these off-balance sheet financing arrangements which
obligated Adelphia for approximately $2.3 billion in debts, together with an entity controlled by
Defendants.

34.     That entity, Highland Holdings ("Highland"), was a closely held partnership
controlled by the Rigases which had borrowed money against the credit facilities. It was further
disclosed that Highland Holdings did not have sufficient assets to cover the debts which would
obligate Adelphia to pay any outstanding amounts. The $2.3 billion amount was eventually raised
to $2.7 billion as Adelphia made further disclosures about its liabilities. In addition, it was
eventually disclosed that half of the Rigases $650 million Adelphia stake was pledged against
margin.

35.     On the same day, March 27, Adelphia Solutions announced that it had filed for
Chapter 11 Bankruptcy protection.

36.     On May 2, 2002, Adelphia further disclosed that it would likely restate its
borrowing numbers in its financial statements to increase them by $1.6 billion, as of.December
31, 2001; $1.2 billion as of December 31, 2000; and $700 million as of  December 31, 1999.

## DEFENDANTS' RESPONSIBILITY FOR INTERNAL
## CONTROLS AND FOR FINANCIAL REPORTING

37.    Defendants had the responsibility to maintain sufficient controls to accurately report Adelphia Solutions' results. The representations made by a company in its financial statements and in other financial disclosures to the public are the representations of that company's management.

38.    According to SEC rules, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a company must establish an internal control structure. Pursuant to §13(b)(2) of the Exchange Act, Adelphia Solutions was required to:

> [M]ake and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
>     (A) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that
>         (1) - transactions are executed in accordance with management's general or specific authorization;
>
>         (ii) transactions are recorded as necessary
>
>             (I) to permit preparation of financial statements in conformity with generally accepted accounting principles....

39.    To accomplish the objectives of accurately recording, processing, summarizing and reporting data, a company must establish an internal control structure. In the structure, according to Appendix D to Statement on Auditing Standards No. 55, Consideration of the Internal Control Structure in a Financial Statement Audit ("SAS 55"), management should consider, among other things, such objectives as (i) making certain that "[transactions are recorded as necessary . . . to permit presentation of financial statements in conformity with generally accepted accounting principles. . . and to maintain accountability for assets," and (ii) making certain that "[the recorded accountability for assets is compared with the existing assets

at reasonable intervals and appropriate action is taken with respect to any differences."

40.    According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility. to provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

AU §319A.13.

41.    Adelphia Solutions had repeatedly represented to investors the adequacy and strength of its internal control systems. However, Adelphia Solutions' lack of internal controls and procedures were deficient in having the process or procedures to review and approve related party transactions including its overhead expenses.

42.    Contrary to the requirements of GAAP and SEC rules, Adelphia Solutions failed to implement and maintain an adequate internal accounting control system. Defendants acting as Adelphia Solutions' management knowingly tolerated the existence of inadequate internal controls and/or recklessly disregarded its obligation to implement adequate controls to ensure that overhead expenses and revenues were properly recorded in compliance with GAAP.

43.    Further, the undisclosed adverse information concealed by Defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

## FRAUD ON THE MARKET DOCTRINE

44.    The market for Adelphia Solutions securities was open, well-developed and

efficient at all relevant times. As a result of the Defendants' materially false and misleading statements and failure to disclose, Adelphia Solutions securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Adelphia Solutions securities relying upon the integrity of the market price of Adelphia Solutions securities and market information relating to Adelphia Solutions and have been damaged thereby.

45.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Adelphia Solutions securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. These statements and omissions were materially false and misleading in that they failed to disclose material information and misrepresented the truth about the Company, its business, finances and operations, as further set forth above.

46.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were substantial contributing causes of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made materially false or misleading statements about Adelphia Solutions' business, finances and operations. These material misstatements and omissions have the cause and effect of creating in the market an unrealistically positive assessment of Adelphia and its business, finances and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members

of the Class purchasing the Company's securities at an artificially inflated price, thus causing the damages complained of herein.

47.    At all relevant times, the market for Adelphia Solutions securities was an efficient market for the following reasons, among others:

(a) Adelphia Solutions securities met the requirements for listing, and was listed and actively traded on the NASDAQ, an efficient market;

(b) As a regulated issuer, Adelphia Solutions filed periodic public reports with the SEC;

(c) Adelphia Solutions regularly issued press releases which were carried by national news wires;

(d) Throughout the Class Period, Defendants actively solicited press coverage and attention from securities brokerage firms and distributed, or caused to be distributed, information and reports to shareholders, securities firms, analysts and customers; and

(e) Throughout the Class Period, it is believed that Defendants met with representatives of securities firms, investors and potential investors, including shareholders, and continuously disseminated false statements about the strength and potential of Adelphia Solutions' business, which statements were relied upon by the investing public.

48.    As planned, Defendants' positive statements and false financial statements and false projections of their expected financial performance continued to support and increased the price of the Company's securities.

49.    As a result, the market for Adelphia Solutions securities promptly digested ongoing information with respect to Adelphia from all available sources and reflected such

information in Adelphia's securities prices. The analysts and securities firms with whom

Defendants met also provided such information about Adelphia Solutions into the markets.

Under these circumstances, all purchasers of Adelphia Solutions securities during the Class

Period suffered similar injury due to their purchase of securities at artificially inflated prices and

a presumption of reliance applies.

## SCIENTER ALLEGATIONS

50.    As alleged herein, Defendants acted with scienter in that Defendants knew that the

public statements, issued or disseminated by or in the name of the Company were materially false

and misleading; knew or recklessly disregarded that such statements or documents would be

issued or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance of dissemination of such statements or documents as primary violators

of the federal securities laws. As set forth elsewhere herein, Defendants, by virtue of their receipt

of information reflecting the true facts regarding Adelphia Solutions, Adelphia, and their

business practices, their control over and/or receipt of Adelphia Solutions' and Adelphia's

allegedly materially misleading misstatements and/or their associations with the Company and

Adelphia which made them privy to confidential or proprietary information concerning Adelphia

Solutions and Adelphia were active and culpable participants in the fraudulent scheme alleged

herein. Defendants were the senior executives and directors of Adelphia Solutions and Adelphia

and knew of their actions in running Adelphia and Adelphia Solutions for their own personal

benefit. The false and misleading nature of the material facts alleged herein which Defendants

caused to be disseminated to the investing public, personally benefitted Defendants. The ongoing

fraudulent scheme described in this Complaint could not have been perpetrated without the

knowledge and complicity of Defendants.

51.     The Defendants engaged in a scheme to inflate the price of Adelphia Solutions securities in order to: (a) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (b) enhance the value of their substantial personal holdings of Adelphia; and (c) prevent the public from.learning of their improper acts concerning the operations of Adelphia and Adelphia Solutions for their own personal benefit.

## FIRST CLAIM
### (Violations of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants)

52.     Plaintiff repeats and realleges the allegations set forth in ¶¶1-57 above. This Claim is asserted against all Defendants.

53.     Each of the Defendants: (a) knew or recklessly disregarded material adverse non-public information about Adelphia Solutions' financial condition, assets, results and related party transactions; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Adelphia Solutions' business and finances.

54.     During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified herein, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to made the statements made, in light of the circumstances under which they were made, not misleading.

55.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue

statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Adelphia Solutions securities during the Class Period..62. Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Adelphia Solutions securities. Plaintiff and the Class would not have purchased Adelphia Solutions securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

(i) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Lead Counsel;

(ii) Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(iii) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(iv) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: June 14, 2002

Respectfully submitted:

**SCHIFFRIN & BARROWAY, LLP**

By: _____
Marc A. Topaz, Esquire (#63782)
Darren J. Check, Esquire (#86279)
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
Telephone:  (610) 667-7706
Fax: (610) 667-7056

**THE EMERSON FIRM**
John G. Emerson
11311 Arcade Drive
Suite 102
Little Rock, AR 72212
Telephone: (501) 907-2555
Fax: (501) 537-7414

**Attroney's for Plaintiff**